# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BEATRICE SHATTUCK, WOODROW
SHATTUCK, PAULA SHATTUCK,
JEREMY VELARDEZ, LUCILLE BOONE,
for herself and on behalf of her minor
daughter, MELANIE BOONE,
ROCHELLE APODACA, CARLOS
APODACA, AGNES DILL, VERONICA
CHAPMAN, ROMALDA SHATTUCK,
AUGUST SHATTUCK, PAUL
SHATTUCK, Jr., and RAQUEL
MONTOYA-LEWIS,

          Plaintiffs,

vs.                                                              No. CIV 04-1287 JB/RHS

ALVINO LUCERO, SEFERINO LENTE,
JAMES A. KERYTE, ANTONIO
CHEWIWI, Jr., BARBARA JIRON-
SANCHEZ, RICHARD OLGUIN, and the
UNITED STATES DEPARTMENT of the
INTERIOR,

          Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion of Pueblo of Isleta Defendants to

Dismiss and Memorandum in Support of Motion, filed February 28, 2005 (Doc. 20).  The primary

issue is whether the Indian Self-Determination Act ("ISDA") creates a private cause of action.

Because the ISDA does not contain an express private cause of action, and because the Court

concludes that Congress did not intend to create a private cause of action in the ISDA, the Court will

grant Defendants Alvino Lucero, Seferino Lente, James A. Keryte, Antonio Chewiwi, Jr., Barbara

Jiron-Sanchez, and Richard Olguin's motion to dismiss the one remaining federal claim because it

does not state a claim upon which relief can be granted under rule 12(b)(6) of the Federal Rules of Civil Procedure and will decline to exercise jurisdiction over the remaining claims sounding in tribal or state law.[1]

## FACTUAL BACKGROUND

This case concerns how the Pueblo of Isleta should distribute funds awarded to the Pueblo in settlement of a claim against the United States in the Court of Federal Claims, Docket 98-166L. See First Amended Complaint ¶ 40, at 10, filed November 24, 2004 (Doc. 2)(hereinafter "Complaint"). A federal statute, the Indian Tribal Judgment Funds Use or Distribution Act of 1973 ("Judgment Funds Act"), requires the Secretary of the Interior to hold these funds in trust for the Pueblo and to prepare and submit to Congress a plan for their use or distribution. See 25 U.S.C. §§ 1401(b), 1402-1403.

In December 2003, the Secretary submitted a plan to Congress which provides that all the funds shall be distributed per capita to Pueblo members living on the plan's effective date, March 20, 2004. See Complaint ¶¶ 43-44, at 11. The plan that the Secretary sent to Congress provides that the Pueblo's Tribal Council shall prepare and submit to the Secretary a list of persons eligible to participate in the distribution, i.e., members living as of March 20, 2004. See id. ¶¶ 46, 64, at 11,

---

[1] In their briefing, the Defendants request that this Court dismiss the Plaintiffs' claims for lack of subject matter jurisdiction. On whether the Court should grant their motion on the Plaintiffs' third claim -- that the Defendants violated the ISDA -- the proper analysis is whether the Plaintiffs have stated a claim upon which relief can be granted. See Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. at 14 n.4 (noting that, after determining there was no implied cause of action in the Investment Advisers Act of 1940, "[t]he District Court was of the view that it was without subject-matter jurisdiction of the respondent's suit. The Court of Appeals recharacterized the District Court's order dismissing the suit as properly based upon the respondent's failure to state a claim upon which relief can be granted, Fed. Rule Civ. Proc. 12(b)(6)"). Having determined there is no private cause of action under the ISDA, the Court therefore concludes that the Plaintiffs have not stated a claim upon which relief can be granted under rule 12(b)(6).

15.  Pursuant to the procedures in 25 C.F.R. Part 61, particularly §§ 61.11 through 61.14, the Secretary then has the responsibility of preparing the final Payment Roll, which may include additions, deletions, or modifications to the Tribal Council's list.  The Secretary's final Roll is subject to individual and tribal appeal rights.

The Pueblo of Isleta first adopted a formal written Constitution in 1947.[2]  Article II of that Constitution provides: "Persons of one-half or more degree of Isleta Indian blood and Isleta parentage shall be members of the Pueblo of Isleta, provided they have not renounced their right to membership.  Other persons of Indian blood may become naturalized members of the Pueblo of Isleta." A Constitution for Isleta Pueblo, New Mexico at 2 (approved March 27, 1947).  In 1990, the Pueblo adopted its current Constitution; Article II of that Constitution reads:

### ARTICLE II -- MEMBERSHIP

The following persons shall be members of the Pueblo of Isleta, provided such persons shall not have renounced, or do not hereafter renounce their membership by joining another tribe or pueblo, or otherwise:

Section 1: Persons of one-half (½) or more degree of Isleta Indian blood and Isleta parentage shall be members of the Pueblo of Isleta, provided they have not renounced their right to membership.

Section 2.  All persons of one-half (½) or more degree of Isleta Indian blood whose names appear on the official census roll maintained by Southern Pueblos Agency, as of January 1, 1970.

Section 3.  Any person of one-half (½) or more degree of Isleta Indian blood born

---

[2] The Court can take judicial notice of the Pueblo's Constitutions and Council Resolutions as official public documents.  Cf. Melton v. City of Okla. City, 879 F.2d 706, 724 n.25 (10th Cir. 1989)(taking judicial notice of city charter and local ordinance), vacated on other grounds en banc, 928 F.2d 920 (10th Cir. 1991); In re Custody of Sengstock, 477 N.W. 2d 310, 314 (Wis. Ct. App. 1991)(taking judicial notice of tribal constitution and law and order code); In re Adoption of Buehl, 555 P.2d 1334, 1336 n.1 (Wash. 1976)(taking judicial notice of tribal law and order code).  The Plaintiffs do not dispute the authenticity of these documents.

after January 1, 1970.

Section 4: Any person of one-half (½) or more degree of Indian blood who is hereafter naturalized or adopted in conformity with an appropriate ordinance of the council or according to the laws and traditions of the Pueblo of Isleta.

Section 5: No person shall be or become a member of the Pueblo of Isleta who is an enrolled member of any other Indian tribe or pueblo.

Section 6: Non-Indians shall never become members of the Pueblo of Isleta.

Section 7: The council shall have the power to adopt ordinances consistent with this constitution, to govern future membership, loss of membership and the adoption or naturalization of members into the Pueblo of Isleta, and to govern the compilation and maintenance of a tribal roll.

Section 8.  No decree of any non-tribal court purporting to determine membership in the pueblo, paternity or degree of Isleta Indian blood shall be recognized for membership purposes.  The council shall have original jurisdiction and sole authority to determine eligibility for enrollment for all tribal purposes except where the membership of the individual is dependent upon an issue of paternity, in which case the courts of the pueblo shall have authority and exclusive jurisdiction.

Pueblo of Isleta Tribal Constitution, art. II, §§ 1-8, at 1-2 (revised 1991).  In sum, under the 1970 Constitution, two categories of persons may be members of the Pueblo of Isleta: (i) persons of one-half or more Isleta Indian blood, see art. II, §§ 1-3; and (ii) persons of one-half or more Indian blood naturalized or adopted by the Pueblo, see art. II, § 4.  The Pueblo's Constitution also provides that "[t]he council shall have original jurisdiction and sole authority to determine" those matters and that "[n]o decree of any non-tribal court purporting to determine membership in the pueblo . . . or degree of Isleta Indian blood shall be recognized for membership purposes."  Id., art. II, § 8 at 2.

Each Plaintiff alleges to be either an adopted or naturalized member of the Pueblo, see Complaint ¶¶ 33-34, at 8, or the lineal descendent of an adopted or naturalized member, see id. ¶¶ 29-31, 33-34, at 7-9, and that he or she has actually been treated as a Pueblo member and is entitled

-4-

to be listed and receive a per capita share of the judgment funds, see id. ¶¶ 2-14, 23, 48-49, at 2-4, 5, 12.  The Defendants are six elected Pueblo officers -- its Governor, the President, Vice President and Secretary of the Isleta Tribal Council, and two other members of the Tribal Council.  See id. ¶¶ 15-20, at 4.

The Plaintiffs contend that, in December 2003, they  began receiving unsigned letters from the Tribal Council notifying them that, based on a review of their files, they were no longer eligible for membership in the Pueblo.  See id. ¶ 24 at, 5.  In January 2004, Defendants Lente, Keryte, Chewiwi, Jiron-Sanchez, and Olguin required those members of the Pueblo, including the Plaintiffs, who received the letter to submit evidence of their Isleta ancestry to the Tribal Council and to rebut the determination that they did not meet the requisite half-blood standards of the Isleta Constitution. See id. ¶¶ 26-27, at 6.  The Plaintiffs maintain that this process violated procedural due process and was invidiously discriminatory.

In compiling the list of members as of March 20, 2004,[3] the Tribal Council, among other things, reviewed available records concerning lineage to determine blood quantum of persons claiming to have been adopted or naturalized so as to determine the status of those persons and their descendants under the Pueblo's "laws and traditions" -- the standard contained in Article II, Section 4.  The Tribal Council held hearings, see Complaint ¶ 37, at 9-10, and ultimately issued decisions on each person's membership eligibility based upon the Council's application of the Pueblo's laws

---

[3] The Defendants represent that the Pueblo's Tribal Council has never exercised its power under Article II, Section 7, to adopt a membership or enrollment ordinance, and there is no actual tribal roll of members.  The Plaintiffs rebut this contention, supplying an ordinance from 1972 which "establish[ed] regulations governing procedures for enrollment and for keeping the membership roll on a current basis."  Ordinance of Isleta Pueblo, at 1 (dated February 14, 1972).  The Plaintiffs did not, however, present the Court with a membership roll.

and traditions.  The Plaintiffs, however, maintain that the hearing process was fundamentally unfair, evidenced by Defendant Lente unlawfully suspending three Tribal Council members who were sympathetic to the Plaintiff's situation and by the meetings being called off or postponed at the last minute.  See id. ¶¶ 37-38, at 9-10.  The Plaintiffs also contend that the Pueblo's Census Office destroyed records contained in individual tribal member's files without the affected tribal members' consent and that such action violated the ISDA census contract.  See id. ¶¶ 50-54, 75-77, at 12-13, 16-17.  The Council determined that certain of the Plaintiffs do not possess the one-half or more degree of Isleta Indian Blood that the Pueblo's Constitution requires for membership in the Pueblo. While the Court must accept the Complaint's allegations as true for purposes of this motion to dismiss, if the matter goes to trial, the Pueblo represents that it will offer proof showing that the Council's determinations were the result of a fair process that was fully open to the Plaintiffs.

The Tribal Council on several occasions reconsidered decisions that it had previously made to ensure consistency in the application of standards among similarly-situated persons.  On February 24, 2005, the Tribal Council determined that, because each Plaintiff and a number of similarly situated persons had been treated de facto as a Pueblo member on March 20, 2004, they should be listed as a person entitled to receive a per capita share of the judgment funds.  See Resolution No. 2005-020; Resolution No. 2005-021; Schedule A, attached to Resolution No. 2005-021.

On December 31, 2003, the Plaintiff Paul Shattuck, on behalf of himself and other Isleta members who had received the letters denying their eligibility for membership, filed an Application for a Restraining Order in the tribal court.  In the Application, Shattuck sought to enjoin the Defendants from manipulating the plaintiffs membership status "until such time that a fair and uniform process has been established that protects the rights of Isleta Tribal Members."  Affidavit

and Application for Restraining Order at ¶ 5, at 3 (dated December 31, 2003).  The Isleta tribal court denied the temporary restraining order request, explaining that the "Court does not have subject matter jurisdiction[,] [because] [o]nly the Tribal Council has the authority to consider the Petitioner's arguments."  Order Denying Temporary Restraining Order for Lack of Subject Matter Jurisdiction at 2 (dated January 20, 2004).

The Plaintiffs allege that, because of the Defendants' actions, they have been denied -- or are threatened with denial of -- the right to vote in tribal elections, the right to annual per capita distributions of tribal trust income,[4] and the right to participate in various tribal and federal programs at the Pueblo.

## PROCEDURAL BACKGROUND

The Plaintiffs' First Amended Complaint asserts five claims.  The Plaintiff's first claim is against the Department of the Interior, alleging a Freedom of Information Act (FOIA) violation.  See Complaint ¶¶ 60-62, at 14.  The parties have, by stipulation, dismissed this claim with prejudice.[5] The Plaintiffs' second claim alleges that the Defendants "submitted inaccurate, inadequate, and invidiously discriminatory lists of enrolled members,"  id. ¶ 66, at 15, thereby "depriving Plaintiffs . . . of their lawful share of the Judgment Fund in Docket 98-166L," id. ¶ 67.  The parties stipulated to dismissal of this claim.  See Stipulation of Dismissal of Second Claim for Relief, filed March 22,

---

[4] The tribal trust income distributions are different from the one-time distribution of the Isleta Judgment Fund, which is the subject of the second claim.

[5] On April 12, 2005, the Plaintiffs and Defendant Department of the Interior entered into a stipulated settlement and dismissed the FOIA claim with prejudice.  See Stipulation of Compromise Settlement and Dismissal with Prejudice, filed April 12, 2005 (Doc.29).  Thus, the Department of the Interior is no longer a party to this action; the remaining claims are only against the Pueblo of Isleta Defendants.

2005 (Doc. 26).

Thus, the current First Amended Complaint has only three remaining claims.  In their third claim, the Plaintiffs allege that the Defendants violated a contract with the Bureau of Indian Affairs ("BIA") under the ISDA.  See Complaint ¶¶ 74-77, at 16-17.  The Plaintiffs seek declaratory and injunctive relief against the Governor and other elected officials of the Pueblo of Isleta "from taking further actions in violation of [the ISDA] contract."  Id. ¶ 4, at 20.  In particular, the Plaintiffs "seek[] a declaration that [the Defendants] have taken cruel, arbitrary, and invidiously discriminatory actions [by] denying Plaintiffs' fundamental rights by disenrolling them, or reducing their official blood quantum," in violation of the ISDA.  Plaintiff's Response to Defendants' Motion to Dismiss at 1, filed April 25, 2005 (Doc. 31).[6]

The Plaintiffs' fourth claim is that the elected Pueblo officials inflicted emotional distress upon them in violation of the provisions of the Pueblo's Constitution and laws.  See Complaint ¶¶ 78-82, at 17-19.  As part of this claim, the Plaintiffs allege that the Pueblo's elected officials have violated "laws of the State of New Mexico, as adopted by the Pueblo."  Complaint ¶ 79, at 18.  The Plaintiffs' fifth claim is that Pueblo officials violated their civil rights protected under the Isleta Constitution.  See id. ¶¶ 83-85, at 19.  The Defendants contend, however, that the Pueblo has not adopted the laws of the State of New Mexico.  The Pueblo's Code of Justice provides that, if a civil action in the Pueblo's courts cannot be determined by applying the "ordinances and customs of the Pueblo or by the laws of the United States, [it] shall be decided by the Pueblo of Isleta Judiciary according to the laws of the State of New Mexico."  Pueblo of Isleta Legal Code § 1-1-17(c), at 5.

---

[6] The Plaintiffs' Response contained a formatting error that prevented the Court from reviewing portions of its Response.  See Plaintiff's Response to Defendants' Motion to Dismiss at 15,18, 23 n.14.

-8-

Pursuant to rule 12(b)(1), Defendants Lucero, Lente, Keryte, Chewiwi, Jiron-Sanchez, and Olguin move the Court to dismiss the Plaintiffs' third, fourth, and fifth claims in this action. The Isleta Defendants contend that the Court lacks subject matter jurisdiction over those claims.

## LAW REGARDING MOTIONS TO DISMISS

While the court must accept the well-pled facts of a plaintiff's complaint as true on a motion to dismiss, see Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995); Ten Mile Indus. Park v. W. Plains Serv. Corp., 810 F.2d 1518, 1524 (10th Cir. 1987), the court is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions," Hackford v. Babbitt, 14 F.3d 1457, 1465 (10th Cir. 1994).

## LAW REGARDING SUITS AGAINST TRIBES

### 1.    Determination of Tribal Membership.

The Supreme Court has long held that an Indian tribe has the exclusive power to confer or withdraw tribal membership, see Roff v. Burney, 168 U.S. 218, 222 (1897), "unless limited by treaty or statute," United States v. Wheeler, 435 U.S. 313, 322 n.18 (1978), superceded in part on other grounds by statute, 25 U.S.C.A. § 1301. Accord Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56-57, 60, 72 (1978). The United States Court of Appeals for the Tenth Circuit has long held that, "in absence of express legislation by Congress to the contrary, a[n Indian] tribe has the complete authority to determine all questions of its own membership." Martinez v. S. Ute Tribe, 249 F.2d 915, 920 (10th Cir. 1957). As the Supreme Court in Santa Clara Pueblo v. Martinez stated:

> A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community. Given the often vast gulf between tribal traditions and those with which federal courts are

more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters.

436 U.S. at 72 n.32 (citations omitted).

> ## 2.     ISDA.

Congress enacted the ISDA, as well as the Indian Civil Rights Act, to promote tribal self-government.  Congress declared the ISDA's primary purpose to be

> the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.  In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 450a(b).  The courts have so interpreted ISDA.  See, e.g., New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 & n.17 (1983)(citing ISDA as example of "Congress' objective of furthering tribal self-government . . . includ[ing] Congress' overriding goal of encouraging 'tribal self-sufficiency and economic development.'" (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980)); White Mountain Apache Tribe v. Bracker, 448 U.S. at 143, 144 n.10 (describing ISDA as one of "a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development"); Demontiney v. United States, 255 F.3d 801, 806 (9th Cir. 2001)(explaining that Congress enacted ISDA "to encourage Indian self-determination and tribal control over administration of federal programs for the benefit of Indians").

The ISDA does not contain any express federal right of action against tribes or tribal officials concerning the tribes' implementation of contracts with the United States to operate contracted

federal programs.  In a few specified instances, ISDA authorizes federal litigation.  See Demontiney v. United States, 255 F.3d at 806-09; 25 U.S.C. § 450d (providing for criminal prosecutions for theft or embezzlement of ISDA funds); id. § 450f(c)(3)(A)(providing limited express waiver of tribal sovereign immunity for activities covered by mandatory liability insurance); id. § 450m-1 (providing federal court jurisdiction over certain claims by tribal organizations against federal agencies under ISDA contracts).  Otherwise, ISDA preserves tribal sovereign immunity.  See 25 U.S.C. § 450n(1) (nothing in ISDA "shall be construed as . . . affecting, modifying, diminishing, or otherwise impairing the sovereign immunity from suit enjoyed by an Indian tribe"); Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 760 (1998)("Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."); Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 510 (1991)("Congress has consistently reiterated its approval of the immunity doctrine. See, e.g., . . . the Indian Self-Determination and Education Assistance Act, . . . 25 U.S.C. § 450 et seq.  These Acts reflect Congress' desire to promote the 'goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.'")(quoting California v. Cabazon Band of Mission Indians, 480 U.S. 202, 216 (1987)).

In Demontiney v. United States, the United States Court of Appeals for the Ninth Circuit held that a tribe was immune from a suit brought against it by a tribal member seeking amounts that the member claimed were due him as a subcontractor to the tribe for work he performed under an ISDA contract between the tribe and the BIA.  The Ninth Circuit concluded that "[t]here is a strong presumption against waiver of tribal sovereign immunity," 255 F.3d at 811, and that neither ISDA nor the subcontract waived the tribes' immunity from suit, id. at 812-14.  Similarly, in Pink v.

Modoc Indian Health Project, Inc., 157 F.3d 1185, 1188-89 (9th Cir. 1998), the Ninth Circuit held

that ISDA did not confer subject matter jurisdiction on a federal court over a suit by an Indian

employee against a tribal health organization because ISDA does not affect tribal sovereign

immunity, relying on 25 U.S.C. § 450n(1)("Because the [ISDA] does not effect tribal sovereign

immunity, the district court was correct in holding that the [ISDA] could not confer subject matter

jurisdiction.").

     The court examines several factors "in determining whether a cause of action is implicit in

a statute not expressly providing one." Santa Clara Pueblo v. Martinez, 436 U.S. at 60. These

factors include:

> First, is the plaintiff one of the class for whose especial benefit the statute was
> enacted--that is, does the statute create a federal right in favor of the plaintiff?
> Second, is there any indication of legislative intent, explicit or implicit, either to
> create such a remedy or to deny one?  Third, is it consistent with the underlying
> purposes of the legislative scheme to imply such a remedy for the plaintiff?  And
> finally, is the cause of action one traditionally relegated to state or tribal law, in an
> area basically the concern of the States or tribes, so that it would be inappropriate to
> infer a cause of action based solely on federal law?

Id. at 1678-79 n.10 (quotations, citations, and alterations omitted)(relying on in part Cort v. Ash, 422

U.S. 66, 78 (1975)).  Since the Supreme Court decided Santa Clara Pueblo v. Martinez, the Supreme

Court has "effectively condensed [Cort v. Ash's four factors] into one--whether Congress, expressly

or by implication, intended to create a private cause of action." Sonnenfeld v. City and County of

Denver, 100 F.3d 744, 747 (10th Cir. 1996)(citing  Thompson v. Thompson, 484 U.S. 174, 189

(1988)(Scalia, J., concurring); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16

(1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 575 (1979).  Accord Southwest Air

Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1169 (10th Cir. 2001)(quoting Sonnenfeld

v. City and County of Denver, 100 F.3d at 747).  As the Tenth Circuit explained:

> Since Cort [v. Ash], the question of Congressional intent has become the main concern and the other Cort [v. Ash] factors have diminished in significance.  The question of implication of private remedies is now viewed as a strict question of "statutory construction" to determine "whether Congress intended to create the private right of action asserted."  Touche Ross & Co. v. Redington, 442 U.S. [at] 568 . . . .
>
> [I]n Touche Ross [ & Co. v. Redington], the Supreme Court employed the familiar maxim "expressio unius est exclusio alterius" to find no implied liability where a statutory scheme contained provisions providing express liability elsewhere.  Thus, there has been a distinct shift away from the full application of the Cort [v. Ash] factors to a narrower exercise of statutory construction in order to glean Congressional intent.

Rawson v. Sears, Roebuck & Co., 822 F.2d 908, 921-22 (10th Cir. 1987)(citations and footnote omitted).  See Miller v. United States, 710 F.2d 656, 667 (10th Cir. 1983)("Subsequent formulation and refinement of the Cort [v. Ash] criteria have indicated that a Congressional intent to create or deny the private remedy asserted is the weightiest factor.")

### 3.   State Court Jurisdiction.

In Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1932), the Supreme Court held that Indian tribes and Indians on reservations are generally, absent congressional authorization, not subject to state jurisdiction.  See id. at 556-57.  The Supreme Court has determined that "'[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history,'" McClanahan v.  State Tax Comm'n, 411 U.S. 164, 168 (1973)(quoting Rice v. Olson, 324 U.S. 786, 789 (1945))(alteration in the original), and recognized that "'Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation,'" Bryan v. Itasca County, 426 U.S. 373, 376 n.2 (1976)(quoting Williams v. Lee, 358 U.S. 217, 220 (1959)).  The Supreme Court recently reaffirmed the rule that, "'[w]hen on-reservation

conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.'" Nevada v. Hicks, 533 U.S. 353, 362 (2001)(quoting White Mountain Apache Tribe v. Bracker, 448 U.S. at 144).   The Tenth Circuit, this District, and the Supreme Court of New Mexico have similarly held that New Mexico regulatory and adjudicatory jurisdiction over tribes and reservation Indians is generally preempted.  See, e.g., Joe v. Marcum, 621 F.2d 358, 362 (10th Cir. 1980); United States v. Morris, 754 F. Supp. 185, 187 (D.N.M. 1991); Benally v. Marcum, 553 P.2d 1270, 1272-73, 89 N.M. 463, 465-66 (1976).

### 4.      Tribal Law and the Exhaustion Doctrine.

The Court does not have original jurisdiction over claims which arise only under tribal law. See, e.g., Kaw Nation v. Lujan, 378 F.3d 1139, 1143 (10th Cir. 2004)("A dispute over the meaning of tribal law does not 'arise under the Constitution, laws, or treaties of the United States' . . . .").

The Supreme Court requires a party to exhaust tribal court remedies even in cases where a federal court has jurisdiction concurrent with a tribal court and even where non-Indian parties are involved.   See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 857 (1985)(federal question jurisdiction); Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987)(diversity jurisdiction).   The tribal exhaustion doctrine is an integral part of the federal government's longstanding policy of promoting tribal self-government. See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. at 856; Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. at 15-16. The Supreme Court in National Farmers Union v. Crow Tribe of Indians and Iowa Mutual Insurance Co. v. LaPlante gave three reasons for the tribal court exhaustion rule. See Navajo Nation v. Intermountain Steel Bldgs., Inc., 42 F. Supp. 2d 1222, 1226 (D.N.M. 1999).  The first was Congress' commitment

-14-

to the policy of encouraging tribal self-government.  See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. at 853-57; Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. at 14 (referring to "the Federal Government's longstanding policy of encouraging tribal self-government").  The Supreme Court in Iowa Mut. Ins. Co. v. LaPlante observed that "[t]ribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development." Id. at 14-15 (citation and footnote omitted).  The Supreme Court also expressed concern that "[a] federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts."  Id. at 15.  See Smith v. Moffett, 947 F.2d 442, 444 (10th Cir. 1991)(referring to federal government's "strong interest in promoting tribal sovereignty, including the development of tribal courts").

A second purpose of the exhaustion doctrine is that "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed."  Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. at 856.  In Iowa Mut. Ins. Co. v. LaPlante, the Supreme Court similarly observed that federal courts should avoid "direct competition" with tribal courts by staying or dismissing cases where both the federal and tribal court may possess concurrent jurisdiction.  480 U.S. at 15-16.

Third, the exhaustion doctrine allows tribal courts to "provide other courts with the benefit of their expertise in such matters in the event of further judicial review," such as in matters of tribal law.  Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. at 857.

The Tenth Circuit held in Mustang Prod. Co. v. Harrison, 94 F.3d 1382 (10th Cir. 1996), that after exhaustion of tribal court remedies, if the federal district court has concurrent jurisdiction over

a case, it "should review tribal courts' findings of fact for clear error and conclusions of law de novo." Id. at 1384.  Accord Duncan Energy Co. v. Three Affiliated Tribes, 27 F.3d 1294, 1300 (8th Cir. 1994)("[T]he district court should review the Tribal Court's findings of fact under a deferential, clearly erroneous standard.  The Tribal Court's determinations of federal law should be reviewed de novo while determinations of Tribal law should be accorded more deference." (citation omitted)).

The Tenth Circuit has routinely required tribal court exhaustion.  See Hartman v. Kickapoo Tribe Gaming Comm'n, 319 F.3d 1230, 1233 (10th Cir. 2003); Texaco Inc. v. Hale, 81 F.3d 934, 937 (10th Cir. 1996); Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d 1166, 1171 (10th Cir. 1992); Smith v. Moffett, 947 F.2d at 444 ("[T]he federal courts have acknowledged the need to allow tribal courts to make an initial determination of tribal jurisdiction over matters arising on Indian reservations.").   The First, Second, Fifth, Eighth, and Ninth Circuits have likewise required exhaustion in such cases.  See, e.g., Gaming World Int'l Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 851-52 (8th Cir. 2003); Bank One, N.A. v. Shumake, 281 F.3d 507, 515 (5th Cir. 2002)("The policy which animates the tribal exhaustion doctrine . . . subordinates the federal court's obligation to exercise its jurisdiction to the greater policy of promoting tribal self-government." (quotation omitted)); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 33-35 (1st Cir. 2000); Allstate Indem. Co. v. Stump, 191 F.3d 1071, 1073-75 (9th Cir. 1999); Basil Cook Enters. Inc. v. St. Regis Mohawk Tribe, 117 F.3d 61, 66-67 (2d Cir. 1997)("As long as a tribal forum is arguably in existence, as a general matter, we are bound by National Farmers to defer to it."); Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412, 1421 (8th Cir. 1996.  The Court in this District has likewise adhered to the principles of National Farmers Union Insurance Cos. v. Crow Tribe of Indians and Iowa Mutual Insurance Co. v. LaPlante in

-16-

requiring exhaustion of tribal court remedies.  In Navajo Nation v. Intermountain Steel Buildings, Inc., the Honorable James A. Parker, United States District Judge, sua sponte required exhaustion of tribal court remedies "even when no action is pending in the tribal court and Indian plaintiffs seek to invoke federal court subject matter jurisdiction."  42 F. Supp. 2d at 1227.  The Court stated that, "[w]hen the dispute at issue is a reservation affair, . . . comity concerns 'almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum.'"  Id. at 1226 (quoting Texaco, Inc. v. Zah, 5 F.3d 1374, 1378 (10th Cir. 1993)).  Judge Parker stated:

> It is difficult to conceive how tribal self-government and self-determination will be advanced by the exercise of federal court jurisdiction over a matter involving the Navajo Nation, a Navajo commercial entity, and a contract between these Navajo parties and a non-Indian defendant to construct a Navajo-owned building located on Navajo land within the boundary of the Navajo Nation.  This is especially true because the parties disagree about the applicability of Navajo law and custom. . . .
>
> * * * *
>
> Moreover, if the Navajo Tribal Court reached the merits of the action, a federal court would have the benefit of the Navajo Tribal Court's prior interpretation of Navajo law and customs that may apply to this case.

Id. at 1229-30.

Judge Parker stated in Chiwewe v. Burlington N. & Santa Fe Ry. Co., 239 F. Supp. 2d 1213 (D.N.M. 2002), that there are five exceptions to the tribal exhaustion rule:

> (1) when "an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith," National Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. [at] 856 n. 21 . . . ; (2) when "the action is patently violative of express jurisdictional prohibitions," id.; (3) when "exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction," id.;  (4) "[w]hen . . . it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by [the main or general rule established in Montana v. United States, 450 U.S. 544. . . (1981) ]," Strate [v. A-1 Contractors], 520 U.S. [438], 459 n.14 [(1997)];  and (5) when the Tribal Court clearly lacks jurisdiction, Nevada v. Hicks, 533 U.S. 353, 369 . . . (2001).

Chiwewe v. Burlington N. & Santa Fe Ry. Co., 239 F. Supp. 2d at 1216.  Montana v. United States,

Strate v. A-1 Contractors, and Nevada v. Hicks concern tribal jurisdiction over non-Indians, as have

virtually all cases that have not required exhaustion.  See, e.g., Burlington N. R.R. Co. v. Red Wolf,

196 F.3d 1059, 1062, 1065 (9th Cir. 1999); Mont. Dep't of Transp. v. King, 191 F.3d 1108, 1113

(9th Cir. 1999).

On the futility exception, the Tenth Circuit has held that "'speculative futility is not enough

to justify federal jurisdiction.'  The [plaintiff] cannot simply assert that it is not subject to tribal court

jurisdiction;  rather, it must actually seek adjudication of this issue in tribal court."  Bank of Okla.

v. Muscogee (Creek) Nation, 972 F.2d at 1170 (quoting White v. Pueblo of San Juan, 728 F.2d 1307,

1313 (10th Cir.1984)).  The futility "exception to sovereign immunity clearly does not apply where

a party voluntarily chooses not to pursue its case in tribal court."  Id. at 1170.

## ANALYSIS

The Court finds that Congress did not intend to create an implied private cause of action

under the ISDA.  Accordingly, the Court will dismiss the Plaintiffs' third claim against the Pueblo

of Isleta's elected officials for failure to state a claim upon which relief can be granted under rule

12(b)(6),  and  will  dismiss  the  Plaintiffs'  fourth  and  fifth  claims  for  lack  of  subject  matter

jurisdiction.

**I.      THE PLAINTIFFS HAVE NOT STATED A CLAIM UPON WHICH RELIEF CAN
         BE GRANTED IN THEIR THIRD CLAIM THAT PUEBLO OFFICIALS HAVE
         VIOLATED A CONTRACT UNDER THE ISDA.**

The Plaintiffs' third claim is that Pueblo officials violated a contract between the Pueblo and

the BIA under the ISDA by failing to perform a proper census of tribal members.  See Complaint ¶¶

74-77, at 16-17.  ISDA creates no federal right of action against tribal officials, and, therefore, the

-18-

Plaintiffs have not stated a claim upon which relief can be granted under rule 12(b)(6).

The Plaintiffs have not brought suit against the Isleta Pueblo; instead, they sued individual officers. Even assuming that, "[a]s [] officer[s] of the pueblo, [the Defendants are] not protected by the tribe's immunity from suit," <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. at 59, the Court declines to imply a federal cause of action in the ISDA.

The Plaintiffs have not pointed to a treaty or statute limiting the Isleta Pueblo's exclusive power to confer or withdraw membership. The Court has not found any. In this case, as in <u>Ordinance 59 Ass'n v. United States Dep't of Interior</u>, 163 F.3d 1150 (10th Cir. 1998):

> No matter how this case is approached, the [plaintiff] is asking this court to step in and tell a tribal government what to do in a membership dispute. Whether federal intervention would be right, wrong, or well-intentioned, that intervention is exactly the kind of interference in tribal self-determination prohibited by *Santa Clara*.

<u>Id.</u> at 1157.

### 1.    **ICRA.**

The conclusion from the precedent is that the Plaintiffs have no private right of action in the Court to challenge membership determinations by the Pueblo's elected Council. The Plaintiffs concede that their claims do not arise under the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301-1303, the statute involved in <u>Santa Clara Pueblo v. Martinez</u>. <u>See</u> Response at 2. Nevertheless, the Plaintiffs argue that a number of courts have treated tribal membership decisions as appropriate for federal court review. In support of that contention, they cite two cases -- <u>Poodry v. Tonawanda Band of Seneca Indians</u>, 85 F.3d 874 (2d Cir. 1996), and <u>Quair v. Sisco</u>, 359 F. Supp. 2d 948 (E.D. Cal. 2004). Both these cases sought habeas corpus relief under the ICRA, 25 U.S.C. § 1303, for membership disenrollment and permanent banishment from reservation lands. <u>See</u>

Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d at 876; Quair v. Sisco, 359 F. Supp. 2d at 971.  The plaintiffs in Poodry v. Tonawanda Band of Seneca Indians argued that they had been summarily convicted of treason and subjected to physical attacks -- including "stoning" -- and denied electrical service to their homes.  See 85 F.3d at 876-78.

The Second Circuit in Poodry v. Tonawanda Band of Seneca Indians held they had habeas corpus jurisdiction under the express provision for such review in the ICRA because "the orders of permanent banishment constitute punitive sanctions imposed for allegedly criminal behavior," Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d at 879; id. at 889, and constitute "a severe actual or potential restraint on liberty," id. at 880.  The Second Circuit noted the Supreme Court's observation in Santa Clara Pueblo v. Martinez

> that it would be unwise to infer a cause of action that would intrude upon a tribe's right to adopt and enforce a membership ordinance does not bear upon whether an explicitly created habeas remedy applies where an individual--who concededly satisfies the general criteria for membership--is stripped of that membership in direct response to allegedly prohibited conduct.

Id. at 888-89.[7]

---

[7] In so holding, the Second Circuit rejected the tribe's argument that "a federally recognized Indian nation possesses complete and absolute authority to determine all questions of its own membership." Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d at 888.  As the Second Circuit explained:

> While Congress has deferred with regularity to tribal membership determinations, see Felix S. Cohen, Handbook of Federal Indian Law 23 (1982), there is little question that the power to define membership is subject to limitation by Congress, see id. at 248, 252 n.84.  Whether § 1302 of the ICRA does in fact impose any limits on tribal authority to determine questions of membership in the tribe is a question on the merits, and one not resolved in Santa Clara Pueblo.

Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d at 888.  While the Court does not necessarily disagree with this analysis, the Plaintiffs did not present to the Court -- nor could the Court locate -- any Congressional limitation on the Pueblo's authority to make membership determinations.

The Court does not believe these cases direct it to imply a cause of action in this case.  This case is not a habeas petition under the ICRA.  See Quair v. Sisco, 359 F. Supp. 2d at 971 (holding that the court had habeas corpus jurisdiction under the ICRA arising out of disenrollment and banishment of tribal members).  Thus, the Court's inquiry is not whether there is jurisdiction based on an express cause of action, i.e. habeas corpus under the ICRA, but instead whether there is an implied cause of action under the ISDA.  The Court concludes, for the foregoing reasons, that there is not.

> **2.      ISDA.**

The Plaintiffs seek to avoid Santa Clara Pueblo v. Martinez' limitations by contending that case and its progeny hold only that there is no implied private right of action to challenge Pueblo membership decisions under the ICRA.  The Plaintiffs contend that there is a private right of action under the ISDA.  There are, however, flaws to that argument.

The Court must apply statutory construction principles to the ISDA and determine "whether Congress intended to create the private right of action asserted." Rawson v. Sears, Roebuck & Co., 822 F.2d at 921 (quoting Touche Ross & Co. v. Redington, 442 U.S. at 568).  For the reasons stated below, the Court concludes that Congress did not intend to create a private cause of action under the ISDA.

First, ISDA contracts transfer to tribes responsibility for planning and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to federal law.  See 25 U.S.C. §§ 450b(j) and 450f(a).  Membership determinations are not contractable federal programs or services that the federal government provides to a tribe, but are decisions that the tribe makes in the exercise of its inherent sovereignty.  Contracting to maintain census records

does not federalize membership decisions and subject them to federal court jurisdiction.  Although the Plaintiffs have made certain allegations concerning records maintenance, their claims concern membership determinations.  ISDA does not deal with the matter of membership determinations and does not confer federal jurisdiction over that issue.

Second, like the ICRA, which expressly authorized federal court habeas corpus relief, see Santa Clara Pueblo v. Martinez, 436 U.S. at 57-58, 60-62 -- the ISDA provides for express causes of action in federal court for certain claimed violations of the statute, such as claims against tribes covered by mandatory liability insurance, see 25 U.S.C. § 450f(c)(3), and claims by tribes against federal agencies under ISDA contracts, see id. § 450m-1.  The ICRA does not provide for claims by individual plaintiffs against tribes asserting civil rights violations.  Santa Clara Pueblo v. Martinez teaches that these express causes of action indicate that Congress did not intend to imply causes of action for different violations of a statute.

Third, as the Supreme Court held in Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe, the ISDA "reflect[s] Congress' desire to promote the goal of Indian self-government . . . ." 498 U.S. at 510 (quotation omitted).  ISDA states that its purposes include a commitment "to supporting and assisting Indian tribes in the development of strong and stable tribal governments." 25 U.S.C. § 450a(b).  See New Mexico v. Mescalero Apache Tribe, 462 U.S. at 335.  The Plaintiffs concede that strengthening tribal self-government and autonomy is the ISDA's dominant, if not exclusive, purpose.  See Resp. Brief at 14-17.  The Supreme Court's decision in Santa Clara Pueblo v. Martinez teaches that implying federal causes of action against tribal officials for civil rights violations frustrates, not furthers, tribal self-government.  See 436 U.S. at 62-66.

Fourth, the Plaintiffs concede that Congress enacted the 1994 amendments to the ISDA --

-22-

including the mandatory model agreement contained in those Amendments on which they rely as implying their cause of action -- with the purpose of strengthening tribal self-government.  Congress wished to remove obstacles in federal procurement regulations and procurement contracts which federal agencies imposed to excuse their refusal to enter into contracts for tribes to administer federal programs.  In the amendments, Congress therefore "limit[ed] the promulgation of regulations under the [ISDA] . . . [and] . . . prescribe[d] the terms and conditions which must be used in any self-determination contract."  S. Rep. No. 103-374, at 1.

As the Plaintiffs also acknowledge, <u>see</u> Response at 15-16, at the time that Congress enacted the 1994 Amendments, <u>Santa Clara Pueblo v. Martinez</u> and other caselaw precluded federal court review of tribal membership decisions -- as it had for several previous decades.  The Plaintiffs admit that the 1994 Amendments contain no express provision allowing a federal court action or other remedy.  <u>See</u> Response at 17-18.  While the Plaintiffs speculate that Congress must have intended the Amendments to imply a remedy for a private individual claiming that a tribe contracting under ISDA violated his civil rights, the more reasonable inference is that -- had Congress intended to alter settled caselaw and permit federal courts to set aside tribal membership determinations in a statute designed  to strengthen tribal authority -- it would have done so expressly.

The Plaintiffs infer legislative intent to create a private right of action based on a failed proposal during the 1994 amendment process that would have given tribal courts jurisdiction over disputes between the federal government and the tribe under an ISDA contract.  While making inferences based on "Congressional inaction" is "dangerous," <u>Pension Benefit Guar. Corp. v. LTV Co.</u>, 496 U.S. 633, 650 (1990), the more likely inference is that Congress chose not to subject the federal agencies to tribal court jurisdiction.  <u>Cf.</u> 25 U.S.C. § 450m-1.

Fifth, court decisions following the 1994 amendments have rejected claims that courts should imply private rights of action against tribes to enforce the ISDA's provisions. The United States Court of Appeals for the Ninth Circuit held in <u>Solomon v. Interior Regional Hous. Auth.</u>, 313 F.3d 1194 (9th Cir. 2002), that the ISDA does not create a private right of action for an Alaska Native who applied unsuccessfully for a job with a Native Alaskan Regional Housing Authority to sue the Authority for violation of the ISDA's Indian employment preference provision. The Ninth Circuit relied heavily on the legislative intent of the ISDA, concluding that § "450a articulates the congressional policy underlying the [ISDA] . . . [and] shows that Congress intended to allow Indian people and tribes greater freedom in self-governance at the tribal or community level, not to confer individual rights on individual Indians." <u>Id.</u> at 1198. The Ninth Circuit also observed that "subjecting an Indian organization to an individual action for damages for every decision to hire a non-Indian for a particular position would undermine the Indian organization's autonomy, not enhance it." <u>Id.</u> at 1199.

The Ninth Circuit in <u>Solomon v. Interior Regional Housing Authority</u> also determined -- like the Supreme Court in <u>Santa Clara Pueblo v. Martinez</u> -- that

> When Congress includes a provision in one part of a statute but excludes it in another, we deem the difference intentional and assign meaning to the omission. Congress did provide a private right of action to enforce the provisions of the [ISDA] against federal officials who are responsible for administering the grants or self-determination contracts. 25 U.S.C. § 450m- l. The absence of a parallel provision with respect to recipients of grant funds, such as the Authority, strongly implies that Congress did not intend to provide a private right of action against them.

313 F.3d at 1199 (citation omitted). And although the Honorable Betty B. Fletcher, Circuit Court Judge, dissented in <u>Solomon v. Interior Regional Housing Authority</u>, she distinguished the Indian employment preference in ISDA from a tribal membership decision: "At the heart of *Santa Clara*

*Pueblo* was a question that could not lie closer to the core of the very concept of Indian self-determination:  the right of Indian tribes to determine who is a member of a tribe and who is not. . . .  It is difficult to conceive of an issue more central to tribal self-government than the right of self-determination."  313 F.3d at 1203.

Moreover, the Plaintiffs concede that they "do not dispute the Pueblo of Isleta's right or power 'to define its own membership for tribal purposes.'  The[] [Plaintiffs] do not challenge the authority of the Tribal Council."  Response at 10.  The "Plaintiffs seek no [] declaration [that they are entitled to tribal membership], and fully understand that this Court has no jurisdiction to determine who is, or who is not, a member of the Pueblo of Isleta."  Id. at 8.  Instead, the Plaintiffs ask this Court to declare as illegal the methods employed by the Defendants in making membership determinations.  The Plaintiffs seek a federal forum in which they can enforce rights which they allege the ISDA confers upon them.  As in Santa Clara Pueblo v. Martinez, the Court concludes that, based on the legislative history and structure of the ISDA, implying a cause of action in ISDA would "plainly be at odds with the congressional goal of protecting tribal self-government.  Not only would it undermine the authority of tribal forums, but it would also impose serious financial burdens on already 'financially disadvantaged' tribes."  436 U.S. at 64 (citation omitted).

For these reasons, there is no sound basis to imply a right of action from ISDA's purposes. An analysis of the statute's structure and purpose, as well as of the caselaw interpreting the ISDA, indicate that Congress did not intend to create a private cause of action under the ISDA.  See Sonnenfeld v. City and County of Denver, 100 F.3d at 747.  The Plaintiffs, therefore, have not stated a claim upon which relief can be granted under rule 12(b)(6).

-25-

**II.     BECAUSE THERE IS NO REMAINING CLAIM ON WHICH THE COURT HAS ORIGINAL JURISDICTION, THE COURT WILL DECLINE TO EXERCISE <u>SUPPLEMENTAL JURISDICTION</u>.**

Having dismissed all claims on which the Court had original federal jurisdiction, the Court, pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the state law claims.  See <u>Pruitt v. Comcast Cable Holdings, LLC</u>, 100 Fed. Appx. 713, 717 (10th Cir. June 3, 2004)(unpublished decision)(holding that the district court's refusal to exercise supplemental jurisdiction over plaintiff's state law contract claims after dismissing all federal claims was "clearly authorized under 28 U.S.C. § 1367(c)(3)").   Under 28 U.S.C. § 1367(a),  "in any civil action of which the district courts have original jurisdiction, [a] district court[] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."   A district court, however, "may decline to exercise supplemental jurisdiction . . . if[:]"

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The third provision applies to this case.  The Court has dismissed the only remaining claim on which it had original jurisdiction -- the ISDA claim.  None of the other claims -- the fourth claim for intentional infliction of emotional distress or the fifth claim for violation of

Isleta's constitution -- confers original jurisdiction in this Court.  The remedies for tribal law claims lie in tribal forums.  Those forums are the Pueblo's own courts for tort claims like the Plaintiffs' claim for intentional infliction of emotional distress and the Tribal Council for membership determinations, which the Council has the sole authority to make.  While the Plaintiffs allege they have exhausted tribal remedies, they do not allege that they ever filed suit in tribal court asserting intentional infliction of emotional distress; exhaustion of tribal remedies is required for such a claim. On the fifth claim, that Pueblo officials violated their civil rights protected under the Isleta Constitution, filing for a protective order in the Isleta Tribal Courts is not the equivalent to filing a suit alleging a civil rights violation under the Isleta Constitution.  Nevertheless, even if filing a motion for protective order constituted exhaustion of the fifth claim in the Tribal Court, the Court lacks jurisdiction over this claim because it involves membership determinations -- a matter over which this Court lacks jurisdiction.  See Ordinance 59 Ass'n v. United States Dep't of Interior, 163 F.3d at 1157; Martinez v. S. Ute Tribe, 249 F.2d at 920.

Because there is no implied federal cause of action under the ISDA, and because there are no remaining claims upon which the Court has federal question jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining claims.  Accordingly, the Court will grant the Defendants' motion to dismiss.

**IT IS ORDERED** that the Motion of Pueblo of Isleta Defendants to Dismiss and Memorandum in Support of Motion is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Tim Vollmann
Albuquerque, New Mexico

   *Attorney for the Plaintiffs*

David Iglesias
   United States Attorney
Manuel Lucero
   Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the Defendant United States Department
      of the Interior*

David C. Mielke
Gary F. Brownell
Reid Peyton Chambers
Heather Whiteman Runs Him
Sonosky, Chambers, Sachse, Endreson & Mielke, P.C.
Albuquerque, New Mexico

   *Attorneys for the Defendants  Alvino Lucero, Seferino Lente, James A. Keryte, Antonio
      Chewiwi, Jr., Barbara Jiron-Sanchez, and Richard Olguin*

-28-